IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| DANIELLE LYNN KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2-12-CV-04317-REL-SSA |
| | ) | |
| CAROLYN COLVIN, Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Danielle Lynn Kennedy seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Titles II and XVI

of the Social Security Act ("the Act").   Plaintiff argues that the Administrative Law Judge (ALJ)

(1) failed to follow the sequential evaluation process; (2) failed to properly evaluate the medical

opinions from examining psychologists; (3) failed to properly consider the decision of the

Missouri Medicaid agency finding plaintiff disabled; and (4) failed to adequately discuss the

work-related limitations imposed by plaintiff's current treating physician.   I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled.   Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.      BACKGROUND

On October 2, 2007, plaintiff applied for disability benefits alleging that she had been

disabled since January 5, 2004.[1]   Plaintiff's disability stems from a combination of physical and

mental impairments.   Plaintiff's applications were denied on November 19, 2007.   On May 4,

2009, a hearing was held before an ALJ.   On September 4, 2009, the ALJ found that plaintiff

_____

[1] On May 4, 2009, plaintiff amended her alleged disability onset date to April 23, 2009.

was not under a "disability" as defined in the Act.   On February 17, 2011, the Appeals Council denied plaintiff's request for review.

On April 14, 2011, plaintiff, having exhausted her administrative remedies, filed a complaint with the United States District Court for the Western District of Missouri, Central Division (Case No. 2:11-CV-04107-GAF-SSA).   On January 19, 2012, United States District Court Judge Gary A. Fenner reversed the 2009 ALJ's decision and remanded plaintiff's claim to the Commissioner of Social Security under sentence four of 42 U.S.C. § 405(g) for further proceedings.   On February 22, 2012, the Appeals Council vacated its refusal to review the 2009 decision, vacated that decision, and remanded plaintiff's claim to an ALJ.[2]

On September 6, 2012, a different ALJ conducted a supplemental hearing.   On September 17, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act.   Plaintiff did not file exceptions.   Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), respectively, provide for judicial review of a "final decision" of the Commissioner.   The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.   42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).   The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.   Universal Camera

---

[2]  In the interim, the Social Security Administration established a hearing office in Columbia, Missouri. Therefore, on remand, the claim was assigned to a different ALJ than the one who had heard the claim in

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq. and 416.901, et seq.   The five-step sequential

evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520 and 416.920

and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments
which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational experts at the May 4,

2009 and September 6, 2012 hearings, in addition to documentary evidence admitted at the

hearings.

### A.     ADMINISTRATIVE REPORTS

The record includes the following report showing plaintiff's earnings for the years 1984

through 2007:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|

| | | | |
|---|---|---|---|
| 1984 | $ 2,334.96 | 1996 | $ 5,093.37 |
| 1985 | 4,853.38 | 1997 | 12,399.46 |
| 1986 | 6,934.93 | 1998 | 14,500.42 |
| 1987 | 9,620.22 | 1999 | 17,253.24 |
| 1988 | 2,125.18 | 2000 | 17,427.79 |
| 1989 | 1,054.66 | 2001 | 16,966.49 |
| 1990 | 0.00 | 2002 | 2,388.00 |
| 1991 | 0.00 | 2003 | 77.50 |
| 1992 | 4,178.61 | 2004 | 1,609.54 |
| 1993 | 4,083.75 | 2005 | 5,697.67 |
| 1994 | 14,865.32 | 2006 | 1,823.26 |
| 1995 | 11,276.98 | 2007 | 614.40 |

## B.    SUMMARY OF MEDICAL RECORDS

The medical evidence reveals clinical signs and laboratory findings of several physical and mental impairments for plaintiff.   For example:

- A 1994 lumbar spine MRI showed disc herniation, although 1994 cervical spine x-rays showed no abnormalities.

- Various thoracic and lumbar-spine x-rays disclosed mild degenerative changes.

- Imaging of plaintiff's left wrist, following a 2007 automobile accident, showed a left scaphoid fracture with subsequent avascular necrosis.

- A May 2012 imaging showed mild degenerative joint disease of plaintiff's bilateral hands and shoulders.   The examinations reported "minimal" or "mild" abnormal clinical signs, and positive fibromyalgia trigger points.

- Plaintiff was diagnosed with hepatitis C and chronic obstructive pulmonary disease

(COPD). However, she was not being treated for her hepatitis C, and there are no pulmonary function studies or liver biopsy reports dealing with hepatitis C in the record.

- Plaintiff was treated for anxiety, panic attacks, and depression.

- Plaintiff used muscle relaxers and anti-pain medication, including narcotics, for her musculoskeletal complaints; an inhaler for her respiratory problems; received medication for emotional problems.

However, plaintiff was never hospitalized for any of her impairments, physical or mental. She did not undergo physical therapy. She did not undergo low back or left wrist surgery; instead, she received injections and wore a wrist brace. Plaintiff was never directed to use or provided an assistive device for ambulation, a back brace, a cervical collar, or a TENS unit for pain.

## C. SUMMARY OF TESTIMONY

During the 2009 and 2012 hearings, plaintiff testified. Additionally, in 2009, Jay Dolan, a vocational expert, was called and testified at the request of the ALJ; and in 2012, Bonny Brasher Ward, a vocational expert, was called and testified at the request of the ALJ.

## 1. Plaintiff's testimony

Plaintiff testified that she was born on May 19, 1967. Plaintiff stated that she is 5'6 ¾" or 5'7" tall and weighs 168-170 pounds. She reported that she is right-handed. Plaintiff has a high school diploma and but no further education or training. Plaintiff related that she is divorced and has three adult children, none of whom live with her. In 2009, plaintiff reported that she lived in a house with her significant other; and in 2012, she reported that she lived in an apartment with her parents.

Plaintiff testified that she last worked in February 2007, when she made cards for Hallmark. She recounted her previous employment as including an insulation installer, a

laundry worker at a nursing home, a shift manager at a Taco Bell, an assembler and later a shift assistant supervisor at a company that assembled computer circuit boards, and an emergency-brake assembler.

When asked to describe a typical day in 2009, plaintiff stated that she would rise between 8:00 and 9:00 in the morning, fix herself a light breakfast, avoid cooking, avoid house work, watch TV, read books, take a hot shower or bath, wash breakfast dishes, wash small loads of laundry, and drive to a grocery store when necessary; in the afternoon, she would sit, spend time with her dog, finish laundry, attend doctor appointments, and occasionally go out to eat.   In 2012, plaintiff reported that she would walk the dog, watch television, put dishes in the dishwasher, wash her clothes, talk to or spend time with a friend, and lay down with a heating pad.

When questioned about her left wrist in 2009, plaintiff reported that she fractured it, did not undergone surgery, used a brace, and continued to experience pain.   In 2012, plaintiff reported a ganglion cyst on the left wrist, which was in the process of being removed.

When asked about her spinal complaints in 2009, plaintiff described an on-the-job injury in 1990s to her lower back, which did not require surgery but resulted in her receipt of worker's compensation.   In both 2009 and 2012, plaintiff described ongoing pain in her low back, neck, and leg.

When asked to describe her pain in 2009, plaintiff rated it as "6-7" on a scale of "1-10," which could be reduced to about a "3" with her prescription medication.   In 2012, plaintiff said that she experienced pain every day, and that the pain worsened in rainy and cold weather.   In 2012, plaintiff admitted that her pain improved with activity.   She also indicated that she had to use a heating pad several times a day, while lying down or siting in a recliner, to address her pain.

When questioned about alcohol and illicit drugs, plaintiff admitted in both 2009 and 2012 to the use alcohol (reportedly discontinued because of her pain medication) but denied any illicit drug use.

As to medication side effects in 2009, plaintiff denied any side effects ; in 2012, plaintiff reported that some of her anti-pain medication made her "sleepy," which limited her driving.

When questioned about physical problems that would prevent her from working, plaintiff identified her respiratory problems in both 2009 and 2012, and reportedly used an inhaler two to four times a day to relieve the symptoms. In 2009, plaintiff acknowledged that she continued to smoke about one pack of cigarettes a day; and in 2012, she indicated that she reduced her cigarette consumption to about five to 10 cigarettes a day.

When queried about other medical problems in 2009 and 2012, plaintiff described panic attacks and anxiety, depression with crying spells, and poor concentration and memory. Plaintiff noted that her panic attacks occurred mainly at Wal-Mart when it was busy. While conceding thoughts of suicide, plaintiff denied ever having a plan to harm herself or anyone else; she also denied any hallucinations. In 2012, plaintiff reported that she consulted with mental health providers, but that her family physician prescribed her medications for depression. Plaintiff testified that her anti-depressant medication helped.

When questioned about her physical abilities, plaintiff estimated in 2009 that she could stand up 15-20 minutes and walk a city block, but in 2012, she reported being able to walk only one-quarter block before needing to stop and rest. In 2009, plaintiff represented that she could lift five to 10 pounds; but in 2012, she complained of problems lifting a gallon of milk. In both 2009 and 2012, plaintiff reported problems bending, kneeling, and climbing steps.

## 2. Vocational expert testimony

In 2009, vocational expert Jay Dolan testified at the request of the ALJ.

The expert classified plaintiff's past relevant work as unskilled to skilled and sedentary to medium.

In response to a hypothetical consistent with plaintiff's age, education, past work experience, and a residual functional capacity (RFC) for light work with lifting, carrying, pushing, and pulling of 20 pounds occasionally and 10 pounds frequently; sitting, standing, and walking, each, for six hours out of eight hours; occasional climbing, balancing, stooping, crouching, kneeling, and crawling; occasional using the left upper extremity for fine and gross manipulation; and doing no more than simple and repetitive tasks, Mr. Dolan testified that plaintiff would be unable to return to any of her past employment as performed, except the laundry worker position. Mr. Dolan agreed that plaintiff had no transferable skills from past employment due to the limit to simple/repetitive tasks; however, he identified several other unskilled jobs that plaintiff could perform including fast food counter worker, cashier, and housekeeping cleaner.

In response to a second hypothetical that reduced the exceptional abilities to sedentary work with sitting six out of eight hours but walking and standing limited to two out of eight hours, the vocational expert again conceded that there were no transferable skills; however, he reported that plaintiff could perform the jobs of food and beverage order clerk, cashier, and telephone solicitor. The expert acknowledged conflicts as to the last two jobs between the Dictionary of Occupational Titles (DOT) and his testimony: the DOT identified the cashier job as light and the solicitor job as semi-skilled; however, he testified that, in the "real world," he found sedentary, light, and medium cashiers. The expert provided the numbers for only the sedentary cashier positions in his response to the second hypothetical. As to the telephone solicitor position, Mr. Dolan related that he found in the real work the position can be unskilled, semi-skilled, and skilled, and that the numbers he gave in response to the second hypothetical

were for the unskilled solicitor positions.

In 2012, vocational expert Bonny Brasher Ward testified at the request of the ALJ. The expert classified plaintiff's past relevant work as skilled or unskilled and light to medium.

In response to a hypothetical consistent with plaintiff's age, education, past work experience, and a RFC for light work with standing and walking for six hours out of eight hours and sitting for two hours out of eight hours; occasional stooping, crouching, kneeling, and crawling; occasional climbing stairs/ramps but no climbing scaffolds/ladders/ropes; frequent balancing; avoiding concentrated exposure to fumes, gasses, temperature extremes, unprotected heights, and fast moving machinery; and limiting to simple tasks with occasional interaction with others, the expert testified that plaintiff would be unable to return to any of her past employment, except the assembler job. However, the expert identified several other unskilled jobs that plaintiff could perform including electrical assembler, parking lot attendant, and table worker. The expert explained that while the DOT classified the parking lot attendant job as requiring more than "occasional" interaction with others, the DOT was last updated in 1991 and the parking lot attendant job had changed and was more automated. The expert testified that the table worker position was sedentary.

In response to a second hypothetical that reduced the exceptional abilities to sedentary with sitting six hours out of eight but walking and standing limited to two out of eight hours and modified the non-exceptional limitations to reflect that the identified positions would be best if plaintiff was able to work independently, the expert identified several sample unskilled jobs: table worker, mailer, optical goods assembler, and screener.

When the second hypothetical was further modified to permit a slow pace with no production rate work, allow additional rest periods, and permit missing work three days a month, the expert opined that plaintiff would be unable to maintain any work, explaining that the

additional rest breaks and absenteeism would preclude work maintenance.

## V.     FINDINGS OF THE ALJS

In 2009, the ALJ found that plaintiff had not engaged in substantial gainful activity since 2007; she had several physical and mental impairments; the impairments neither met nor equalled the severity requirements of an impairment listed in Appendix 1; she had a residual functional capacity for less than a full range of light work; she could not return to her past relevant work but could perform other jobs that exist in significant numbers in the national economy.   The ALJ concluded that plaintiff was not disabled.

In 2012, the ALJ found plaintiff had not engaged in substantial gainful activity since 2007; she had a combination of severe impairments; the impairments neither met nor equaled the severity requirements of an impairment listed in Appendix 1; she had a residual functional capacity for less than a full range of sedentary work; she could not return to her past relevant work but could perform other jobs existing in significant numbers in the national economy.   The ALJ concluded that plaintiff was not disabled.

## VI.    ANALYSIS

## A.     DID THE ALJ PROPERLY FOLLOW THE SEQUENTIAL EVALUATION?

Plaintiff first argues that the ALJ erred at step two of the sequential evaluation by failing to identify each of plaintiff's impairments as severe or not severe.

In response, defendant argues the ALJ found that, although some of plaintiff's impairments have only a mild effect when considered individually, the combination of plaintiff's impairments has more than a minimal effect on her physical and mental ability to perform basic work activities; and therefore the ALJ 's RFC reflects that the judge took into account the combination of plaintiff's impairments throughout the remainder of the sequential evaluation. Defendant observes that step two of the sequential evaluation can be met either by a severe

impairment, or by a combination of non-severe impairments that results in sever impairment.

At step 2 of the sequential evaluation, plaintiff must have either a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).

The impairment must be severe. If the individual does not have either a single impairment or a combination of impairments that significantly limits physical or mental ability to do basic work, the individual is not disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

In determining whether an individual's physical or mental impairment or combination of impairments is of sufficient medical severity that it could be the basis of eligibility under the law, the ALJ should consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If the ALJ finds a medically severe combination of impairments, the combined impact of the impairments must be considered throughout the disability process. 20 C.F.R. §§ 404.1523 and 416.923.

Ruling SSR 1985-28 states that a claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability to perform basic work activities. If such a finding is not clearly established by the medical evidence, however, the ALJ must then continue through the sequential evaluation process.

SSR No. 1996-7p requires a determining of whether an individual's impairment or combination of impairments is "severe" at step two of the sequential evaluation.

SSR No. 2003-02p states that any impairment is considered severe when it significantly limits an individual's physical or mental abilities to do basic work activities. An impairment that is not severe must be a slight abnormality, or a combination of slight abnormalities, that

has no more than a minimal effect on the individual's ability to do basic work.

SSR No. 2003-03p notes that impairments, even if not severe, should be considered in combination. Specifically, when an individual has more than one medically-determinable impairment and each impairment by itself is not severe, the ALJ must still assess the impact the combination of these impairments has on the individual's ability to function.

The objective and subjective evidence here shows that plaintiff has multiple physical and mental health complaints, including her non-dominant left hand and wrist; the lumbar and thoracic spine; hepatitis C; COPD; fibromyalgia; and affective and anxiety disorders.

Plaintiff sees her family physician approximately once a month and her mental health providers less often. Plaintiff has undergone spinal and upper extremity imaging. Plaintiff has been prescribed medication for her musculoskeletal pain and mental health problems. In the past, she received injections for her back problems and used a brace for her left wrist. Plaintiff currently uses a heating pad for pain and an inhaler for her COPD.

Plaintiff has not undergone any surgery - not left wrist or lumbar spine surgery. She has not been hospitalized since 2007 for any impairment, physical or mental. Plaintiff has not been prescribed any medication for her hepatitis C and has not undergone Endovascular surgical neuroradiology (ESN), an accredited medical subspecialty specializing in minimally invasive image-based technologies and procedures used in diagnosis and treatment of diseases of the head, neck, and spine. Plaintiff has not used an assistive device for ambulation, a TENS unit for pain, a back brace, or a cervical collar. She has not undergone physical therapy, occupational therapy, acupuncture, chiropractic adjustment, osteopathic manipulation, pain clinic, or work hardening. Plaintiff has not undergone an electromyogram (EMG), a nerve conduction velocity study (NCVS), a liver biopsy for hepititus C, or a pulmonary function study (PFS).

In the 2012 decision, the ALJ noted that the Appeals Council had required that the judge perform a full analysis of the sequential evaluation, particularly to evaluate whether

there were severe impairments at step two of the sequential evaluation.   At step two, the ALJ found:

> The claimant has the following combination of severe impairments: history of fractured non-dominant left w1ist, with non-union due to avascular necrosis; degenerative disk disease of the thoracic and lumbar spine with herniated disks; degenerative joint disease; fibromyalgia; chronic obstructive pulmonary disease; and variously diagnosed mental impairments including, dysthymia, depressive disorder, anxiety disorder, not otherwise specified and panic disorder with agoraphobia (20 CFR 404.1520(c) and 16.920(c)).

> The above listed combination of impairments have been determined by medically acceptable evidence, including signs, symptoms, and laboratory findings, to cause more than slight abnormalities, and significantly limit the claimant's ability and aptitude to perform work for a continuous period of 12 months. (Tr. 665-66).

The finding for step three inquires as to both "impairments" and "combination of impairments."

In determining plaintiff's RFC, the ALJ provided a lengthy discussion about each of the impairments cited in step two.   The judge found a RFC for less than a full range of sedentary work with exceptional, environmental, and non-exceptional limitations.

In her decision, the ALJ considered the impairments cited at step two in her discussion of step three.

The ALJ considered all of the cited impairments when determining plaintiff's RFC.   In determining plaintiff's RFC, the ALJ discussed the medical evidence as to all of the impairments cited at step two, often noting that the evidence only showed "minimal" or "mild" abnormal clinical signs and/or laboratory findings.   The judge considered the treatment modalities as to all of the impairments cited at step two, noting the lack of surgery or inpatient hospitalization, possible "drug seeking," and limited outpatient treatment.   The ALJ discussed treatment modalities, including medication and medication side-effects.

The RFC arrived at by the ALJ is for less than a full-range of sedentary work.   Given the nature of the imitations, e.g., no fumes, gasses, odors, or temperature extremes, safety precautions, standing or walking restricted to two hours, limited interaction with others,

and the cited impairments at step two, no one impairment could cause all of the limitations, and therefore the RFC can only be the result of a finding dealing with a combination of plaintiff's impairments. Because the ALJ found that in combination, plaintiff's impairments are not severe, the judge complied with the legal requirements of step two.

## B.    DID THE ALJ PROPERLY EVALUATION THE EXAMINING PSYCHOLOGIST'S OPINIONS?

Plaintiff's next argument is that the ALJ failed to acknowledge one of the examining psychologist's report and opinions, to note any of the functional limitations assessed, and to evaluate the psychologist's opinions. Additionally, plaintiff complains that the ALJ failed to look at the required factors for two consultative examiners' opinions.

Defendant responds that while the ALJ did not identify the first psychologist by name, the judge sufficiently evaluated psychologist's opinion under the regulatory factors.   As to the opinions of the other two consulting psychologists, defendant argues that the weight given by the ALJ to the opinions is within the permissible range and, equally important, is consistent with the record.

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, describing what an individual can do despite a severe impairment, specifically an individual's physical or mental abilities to perform work-related activities on a sustained basis. SSR 96-5; see 20 C.F.R. §404.1513(a) (defining "acceptable medical source").   Generally, the opinions of an examining psychologist or physician should be given greater weight than the opinions of a source who had not examined the individual. Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).

The Eight Circuit has acknowledged that a plethora of opinions, "admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain" Clevenger v. Soc. Sec. Admin., 567 F.3d. 971, 976 (8th Cir. 2009); and that,

for example, "[t]he ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) (citing Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998). Nevertheless, a claimant's activities should be considered by the ALJ, and a reviewing court should evaluate the ALJ's credibility determination, based in part on daily activities, under the substantial evidence standard. See McDade v. Astrue, 720 F.3d 934, 998 (8th Cir. 2013). In McDade, the court held that the ALJ's credibility finding was supported by substantial evidence when, among other factors, the ALJ considered that the plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart." Id. Similarly, in Clevenger, supra, the court held that it was "not unreasonable" for the ALJ to rely on evidence of the plaintiff's daily activities in finding that her assertion of disabling pain was not entirely credible. Id.

The administrative regulations do not require a plaintiff to be symptom-free in order to be found not disabled. See Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental disturbance is not disabling *per se*, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity). Even though a plaintiff has been prescribed antidepressant drugs, this is not evidence that the mental impairment was disabling. See Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of antidepressant drugs does not show that the claimant is disabled).

The record here reflects that on May 20, 2008, plaintiff underwent a consultative examination by Patrick Finder, a licensed psychologist, at the request of the Missouri Medicaid agency. At the conclusion of the evaluation, Mr. Finder rated plaintiff's Global Assessment of Functioning (GAF) as 40 and opined that plaintiff would not be able to obtain or maintain any type of steady employment.

On August 22, 2008, plaintiff saw Maria Gutierrez, Ph.D., at the request of counsel.[3]  At the conclusion of the evaluation, Dr. Gutierrez rated plaintiff's GAF as 50.   The doctor opined that plaintiff is able to understand and remember simple and detailed instructions; she is able to carry out simple instructions but will struggle with detailed instructions due to poor concentration; plaintiff's ability to follow through with a task is dependent on her depression, anxiety, and physical pain; her social skills are adequate; but plaintiff will have difficulty adapting to an environment because of her anxiety and depression.

On June 16, 2009, plaintiff underwent a consultative examination by Laura L. Brenner, Ph.D., at the request of the ALJ.   At the conclusion of the examination, Dr. Brenner rated plaintiff's GAF as 55.   Furthermore, the doctor found no limitation in plaintiff's ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions, but "marked" limitations in plaintiff's ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.   The psychologist found "mild" limitation in plaintiff's ability to respond appropriately to usual work situations and to changes in routine work settings, and "moderate" limitation in her ability to interact with the public, co-workers, and supervisors.

Although the ALJ did not specifically evaluate Mr. Finder's opinion, the judge did discuss plaintiff's GAF scores, including Mr. Finder's 40 rating.   The judge cited Mr. Finder's report when discussing the medical evidence about plaintiff's mental problems.   Because Mr. Finder's examination was performed in 2008, the ALJ observed that "longitudinally" there was evidence of improvement in plaintiff's mental health problems.   The ALJ also discussed factors such as plaintiff's daily activities and treatment regimen, and the objective medical evidence.

The ALJ evaluated Dr. Gutierrez's opinion and gave it "moderate" weight, explaining the

---

[3] On occasion, plaintiff identifies Dr. Gutierrez as a "psychiatrist".   This is incorrect.   According, to the letterhead of her August 2008 report, she has a "Ph.D." not a M.D. (Tr. 557).

underlying reasoning.   The ALJ discussed the objective medical evidence, the level of treatment, and the GAF ratings, and concluded that plaintiff was restricted plaintiff to simple, unskilled work with limited interaction with others.

The ALJ evaluated Dr. Brenner's opinion and gave the opinion "limited" weight, explaining the reasoning.   The ALJ discussed the objective medical evidence, the level of treatment, and the GAF ratings, and restricted plaintiff to simple, unskilled work with limited interaction with others.

I view the ALJ's findings on the examining psychologists' opinions within the context of the judge's whole decision, especially the discussion of the objective medical evidence, which included the reports from the consultants.   The ALJ spent a considerable amount of time discussing the GAF ratings, plaintiff's daily activities, plaintiff's testimony, and the treatment modalities.   When considered as a whole, I find that the ALJ adequately and properly evaluated the psychologists' opinions.

## C.   DID THE ALJ PROPERLY CONSIDER THE FINDINGS AND OPINIONS OF THE MISSOURI MEDICAID AGENCY?

Plaintiff next argues that the ALJ should have considered the state's finding that plaintiff was disabled for Medicaid purposes, because the state relied on a similar standard on disability.

Plaintiff alleges the Commissioner waived any argument over the preservation of this issue, based on the fact that the Missouri Medicaid agency's decision is not a matter of record here, because (1) in 2009, the ALJ discussed the Missouri Medicaid decision at length; (2) in 2009, on review by U.S. District Court Judge Gary Fenner, counsel argued that the ALJ's decision did not properly weigh this evidence; and (3) in 2009, on review by Judge Gary Fenner, the Commissioner did not argue that the Medicaid determination was not binding or of consequence to the resolution here.   As a consequence, plaintiff argues, the Commissioner effectively conceded the Missouri Medicaid agency finding plaintiff disabled, and waived any

challenge here based on preservation of the issue.

In response, defendant argues plaintiff's administrative record does not contain the Medicaid disability determination. While an ALJ should consider disability decisions by other governmental agencies, the only references in this record to a Medicaid finding are (1) the 2008 treatment references that plaintiff had applied for and received Medicaid (Tr. 548, 576, and 579), and plaintiff's testimony at the first administrative hearing that she received food stamps and a Missouri health card (Tr. 65). When asked about her income at her second administrative hearing, plaintiff did not mention receiving food stamps or Medicaid (Tr. 693).

Defendant also argues that plaintiff did not present a disability determination from Medicaid disclosing the underlying information the agency relied upon to make its determination. See SSR 2006-3p ("These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules.").

Finally, defendant notes that, pursuant to SSR 2006-3p, the ALJ is not bound by disability decisions made by other governmental agencies.

The Commissioner's regulations provide that a decision by any other governmental agency about whether a claimant is disabled or blind is based on its own rules and is not binding. 20 C.F.R. § 404.1504. Consideration of such evidence, however, is essential to a proper determination. Findings of disability by other government agencies, although not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision. Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).

The law-of-the-case doctrine, requiring an ALJ to include a specific RFC limitation that had been included in an earlier decision, does not apply when the district court that first considered the matter never made a finding about the specific RFC limitation. Brachtel v. Apfel, 132 F.3d 417 (8th Cir. 1998).

The law-of-the-case doctrine does not bar an ALJ from finding an ability to perform

past relevant work despite a finding by a prior ALJ otherwise where the district court that considered the initial appeal expressly stated in its order that "the previous [ALJ's] decision [is] reversed and remanded by this court." Steahr v. Apfel, 151 F.3d 1124 (8th Cir. 1998).

Here, the record does not include a copy of plaintiff's Missouri Medicaid determination, a copy of plaintiff's Medicaid card, or the criteria used by the Missouri Medicaid agency in evaluating plaintiff's alleged disability. There is no mention of Medicaid coverage by treating or examining medical sources from 2009 to 2012; and there is no mention of Medicaid coverage in the plaintiff's 2012 testimony at the administrative hearing.

The only references to Medicaid are: (1) plaintiff underwent a consultative psychological examination by Mr. Finder, at the request of the Missouri Medicaid agency in 2008; (2) plaintiff's family physician reported in 2008 statements by plaintiff that she was seeking and received Medicaid; (3) at the 2009 hearing, plaintiff mentioned Medicaid coverage; and (4) in the September 4, 2009 decision, the ALJ discussed the weight to be given to a third party disability determination in his decision, correctly noting that they are not binding upon ALJs.

On January 19, 2012, Judge Fenner found that the ALJ in 2009 did not properly evaluate plaintiff at step two. Judge Fenner did not address the issue of the Missouri Medicaid Agency's decision. The Judge ordered that "the decision of the Commissioner is REVERSED . . . and this matter is REMANDED to the Commissioner." (Tr. 751). And in response to the order, the Appeals Council vacated the September 4, 2009 decision by the first ALJ and remanded the case for further action consistent with the district court order.

Because Judge Fenner found the 2009 decision deficient at step two, he did not address the disability decision made by Missouri Medicaid. Accordingly, it cannot be said that the Commissioner somehow waived the issue when there is substantively nothing in the record about plaintiff's Medicaid coverage in 2012.

Considering the absence of a copy of plaintiff's Medicaid card, let alone a copy of the actual determination, the failure of any treating or examining source to mention Medicaid coverage after 2008, and plaintiff's failure to mention Medicaid coverage during her 2012 testimony, I find that that the ALJ did not err by not addressing Medicaid in the administrative decision.

## D.     DID THE ALJ ADEQUATELY DISCUSS THE TREATING PHYSICIAN'S WORK-RELATED LIMITATIONS?

Lastly, plaintiff argues that the ALJ failed to properly evaluate a May 2009 opinion by plaintiff's family physician, in that the judge failed to include any manipulative limitations from plaintiff's left-wrist impairment. Plaintiff also alleges that the ALJ erroneously determined plaintiff's ability to stand, pointing out that although plaintiff's family physician opined that she could stand or walk for a total of approximately two hours during an eight-hour workday, the standing or walking could not be done continuously since plaintiff would require breaks after 15 to 30 minutes of activity.

In response, defendant cites several factors in the administrative decision that explain why the judge did not impose any additional limitations for manipulation of the left wrist; and argues that while the ALJ accepted much of the family physician's opinion, the judge cited to specific evidence that undermined the physician's conclusions as to plaintiff alternating positions.

The opinion of a treating physician is "generally given controlling weight, but is not inherently entitled to it." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (quoting Hacker v. Barnhart, 439 F.3d 934, 937 (8th Cir. 2006).   An ALJ may elect not to give controlling weight to a treating physician when his or her opinions are "not supported by diagnoses based on objective evidence" or when the opinions are "inconsistent with or contrary to the medical

evidence as a whole." Id. Furthermore, a treating physician's opinions may be given less weight when the opinions are not supported by the doctor's contemporaneous treatment records. See Owen v. Astrue, 551 F.3d 792, 789-99 (8th Cir. 2008).

In this case, Bridget Early, M.D., plaintiff's family physician, answered a series of written interrogatories on May 29, 2009, which had been submitted by counsel. The doctor opined that plaintiff has no restriction on lifting 10 pounds occasionally with her right hand although the left hand and wrist may be weaker due to the fracture. The doctor did not include any specific manipulative limitations. The doctor stated that plaintiff could walk or stand for two hours during an eight-hour workday, if the activity was performed "intermittently," i.e., not all at once. The doctor found no inability to sit for six hours out of eight, with morning, lunch, and afternoon breaks at 2 hour intervals. The doctor reported no problem alternating positions without reclining, no problem stooping, no need to assume a supine or reclining position (actually suggesting that plaintiff should remain active), and no need for extra rest periods, late arrivals, or early departures.

Without specifying any limitations, Dr. Early noted plaintiff has significant, ongoing depression, which is poorly controlled. The doctor also observed that plaintiff has been diagnosed with COPD, with some limitation on her exertion, and fibromyalgia.

In the 2012 decision, the ALJ gave "moderate" weight to Dr. Early's opinion, incorporating many of the doctor's limitations into the RFC. For example, the ALJ found that plaintiff retains a RFC for sedentary work, i.e., lifting or carrying no more than 10 pounds occasionally due to the combination of plaintiff's impairments, including left-wrist fracture, low-back pain, COPD, and hepatitis C. However, the ALJ did not impose any separate limitation on use of plaintiff's non-dominant left hand and upper extremity.

The ALJ limited plaintiff's sitting to six out of eight hours. The ALJ limited plaintiff's

standing or walking to two out of eight hours, but included no restriction to "intermittent" standing or walking. The ALJ did not impose any requirement for reclining, extra rest breaks, or excessive absenteeism.

Although not mentioned by plaintiff's doctor, the ALJ imposed limitations on plaintiff's postural actives such as climbing, based upon plaintiff's 2012 hearing testimony.

Plaintiff's doctor alluded to plaintiff's depression, and the ALJ limited plaintiff to occasional interaction with others, concluding that plaintiff would do best working independently.[4]

Plaintiff's doctor suggested some limitation on plaintiff's exertion level based on COPD, and the ALJ limited plaintiff to sedentary work. Furthermore, although plaintiff's doctor did not mention any environmental limits due to the COPD, the ALJ precluded exposure to fumes, gasses, odors, and temperature extremes.

In addition to the concerns expressed in the treating physician's answers to interrogatories, the ALJ discussed in detail the medical evidence as to plaintiff's spinal problems, her left wrist impairment, her COPD, her fibromyalgia or chronic pain syndrome, and her hepatitis C.

Based on the record, the ALJ had good reason not to completely rely on the interrogatory answers from plaintiff's treating doctor. For example:

- The doctor encouraged plaintiff to engage in physical activity to improve her condition, e.g., walking.

- At the 2012 hearing, plaintiff testified that she walked the dog and that the exercise helped her pain.

- Plaintiff did not undergone back surgery and was not hospitalized for spinal

---

[4] The hypothetical on which the ALJ based her finding of ability to perform other jobs existing in

treatment, and plaintiff worked for more than 10 years following her 1994 back injury - her highest reported income in the years 1994-2001.

- In 2009, plaintiff testified that medication reduced her pain level.

- The ALJ expressed concerns about "symptom magnification" and "drug seeking."

- As to plaintiff's left wrist impairment, plaintiff did not undergo any left wrist surgery; and at the time of the 2012 hearing, she was not wearing a brace.

- As noted by the ALJ, many of plaintiff's clinical examinations reported only minimal or mild abnormal clinical signs, such as decreased range motion, swelling, and the like.

- At the 2012 hearing, plaintiff suggested that her left upper-extremity problems are largely due to a recent ganglion cyst, not a result of the 2007 wrist fracture.

The objective medical evidence, treatment record, and plaintiff's daily activities, provide adequate support for the ALJ's decision to discount the doctor's opinion. Although the ALJ did not give controlling weight to all the doctor's interrogatory answers, the judge restricted plaintiff to less than a full range of sedentary work.

I therefore find therefore that the ALJ's decision to discount the treating physician's opinion is supported by substantial evidence in the record.

## VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.   Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.   It is further

ORDERED that the decision of the Commissioner is affirmed.



/s/ Robert E. Larsen

significant numbers in the national economy also limited plaintiff to "simple unskilled" work.

ROBERT E. LARSEN
United States Magistrate Judge

January 13, 2014
Kansas City, Missouri